Filed 5/3/18

**<u>CERTIFIED FOR PARTIAL PUBLICATION</u>\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LA MIRADA AVENUE NEIGHBORHOOD ASSOCIATION OF HOLLYWOOD et al., <br><br>     Plaintiffs and Respondents, <br><br>     v. <br><br> CITY OF LOS ANGELES et al., <br><br>     Defendants and Appellants; <br><br> TARGET CORPORATION, <br><br>     Real Party in Interest and Appellant. | B282137 <br><br> (Los Angeles County Super. Ct. Nos. BS140889, BS140930) |

    APPEAL from orders of the Superior Court of Los Angeles County. Richard L. Fruin, Jr., Judge. Affirmed.

    Michael N. Feuer, City Attorney, Terry Kaufman Macias, Assistant City Attorney, Kenneth Tom Fong and Kimberly Ai-

---

\*     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of Part II of the Discussion section.

Hua Huangfu, Deputy City Attorneys; Burke, Williams & Sorensen and Anna Corinne Shimko for Defendants and Appellants City of Los Angeles and Los Angeles City Council.

Morrison & Foerster, Miriam A. Vogel; Shoreline Law Corporation, Andrew S. Pauly and Damon A. Thayer for Real Party in Interest and Appellant Target Corporation.

The Silverstein Law Firm, Robert P. Silverstein and David E. Wright for Plaintiff and Respondent La Mirada Avenue Neighborhood Association of Hollywood.

The Law Offices of David Lawrence Bell and David Bell for Plaintiff and Respondent Citizens Coalition Los Angeles.

\* \* \* \* \* \*

Under Code of Civil Procedure section 1021.5,[1] a trial court may award attorney's fees to the "successful party" in a lawsuit that "has resulted in the enforcement of an important right affecting the public interest" if, among other things, the lawsuit confers "a significant benefit" upon "the general public or a large class of persons." If a party is "successful" and has conferred a "significant benefit" by prevailing at trial and obtaining a judgment that a construction project violates the zoning laws in existence at the time, is that party precluded from obtaining attorney's fees under section 1021.5 because the losing party gets the zoning laws changed and the project's validity under the changed law has yet to be finally determined? We conclude that the answer is "no." Consequently, and because we conclude that the trial court did not abuse its discretion in fixing the amount of attorney's fees, we affirm the awards of attorney's fees.

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

2

## FACTS AND PROCEDURAL BACKGROUND

### I.  Facts

Real party in interest Target Corporation (Target) wants to build a retail store on the corner of Western Avenue and Sunset Boulevard in Hollywood, California.

For purposes of zoning, that location is subject to the Los Angeles Municipal Code as well as to a more specific Station Neighborhood Area Plan (SNAP), which for this location is the Vermont/Western Transit Oriented District Specific Plan.  Within the geographic area covered by the SNAP, the location falls within Subarea C.  Under the law in effect at the time, commercial buildings in Subarea C (other than hospitals and "mixed use" buildings (that is, part commercial and part residential)) (1) could not exceed 35 feet in height, (2) were required to incorporate certain aesthetic design elements aimed at avoiding the look of a "big box" store, (3) could not have more than 390 parking spaces, (4) were required to limit the hours during which they accept deliveries, and (5) if the square footage exceeds 40,000 square feet, were required to offer free delivery to local residents.

Target submitted two plans to defendant the City Council of the City of Los Angeles (the City or City Council).  Initially, Target sought to build a retail store that complied with the above stated requirements of the Municipal Code and the SNAP. Subsequently, however, Target submitted a new proposal to build a Super Target retail store.  The Super Target store would be nearly 75 feet in height, complete with a transit plaza, an above ground parking lot with 458 parking spaces, and 163,862 square feet of retail space (the Project).

Because the Project did not comply with the SNAP, the City Council granted eight variances (called "exceptions") from the SNAP pursuant to Los Angeles Municipal Code section 11.5.7.F.2. These variances excepted the Project from the SNAP's height restrictions, many of its design element requirements, its parking space limit, its delivery time restrictions, and its free delivery requirements.

## II. Procedural Background

### A. *Writ Petitions*

Plaintiffs La Mirada Avenue Neighborhood Association of Hollywood (La Mirada) and Citizens Coalition Los Angeles (Citizens) (collectively, plaintiffs), both of which are "community association[s]" that "advocate for residential quality of life issues," filed separate petitions for a writ of mandate against the City (and naming Target as the real party in interest). In their operative first amended petitions, plaintiffs generally alleged "a substantial interest in ensuring that the City's decisions are in conformity with the requirements of the law." More specifically, one or both of those petitions alleged: (1) the Project violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) because the Project's environmental impact report was deficient; (2) the Project violated the Los Angeles Municipal Code because the eight variances from the SNAP were not supported by substantial evidence; (3) the City Council denied plaintiffs a fair hearing; and (4) the City did not comply with the laws governing open meetings. With respect to the alleged violation of the Municipal Code, plaintiffs sought (1) "to vacate and set aside the actions approving the [SNAP] exceptions for the Project, and [to have] the Court invalidate the exceptions"; (2) to "enjoin the City . . . from granting any authority, permits or

4

entitlements . . . pursuant to the [SNAP] exceptions"; and (3) to "enjoin . . . any activities or construction pursuant to the [SNAP] exceptions."

## B. *Trial Court's Partial Grant of the Writ Petitions*

Following full briefing, the trial court issued a 28-page order partly granting and partly denying plaintiffs' writ petitions. The court denied the writs insofar as they alleged violations of CEQA and the denial of a fair hearing. And plaintiffs had by that time already abandoned their claim that the City Council had violated the open meeting laws. However, the court concluded that six of the eight SNAP variances violated the Los Angeles Municipal Code because they were not supported by substantial evidence; of the variances alleged to be invalid, the court only upheld the variance for the number of parking spaces and the waiver of the home delivery requirement. In July 2014, the trial court entered judgment for plaintiffs on the writs invalidating six of the eight Municipal Code variances, enjoining any actions "in furtherance of" those variances, and "immediately . . . restrain[ing] . . . all construction activities." The judgment also authorized plaintiffs to seek attorney's fees.

## C. *Appeals of Writ Petitions (*La Mirada I*)*

Both Target and La Mirada appealed the judgment.

While the appeals were pending, and at Target's urging, the City Council amended the SNAP to create a new Subarea F, to delineate Subarea F's geographical boundaries to include the Project, and to define Subarea F's zoning rules to allow for big retail stores like the Project.

Target asked this Court to hold the pending appeals in abeyance and consolidate them with the anticipated appeals in the next round of litigation challenging the SNAP amendments.

5

In a published ruling, this Court dismissed the appeals as moot but left the judgment intact. (*La Mirada Avenue Neighborhood Assn. of Hollywood v. City of Los Angeles* (2016) 2 Cal.App.5th 586, 588-592 (*La Mirada I*).)

### D. *Challenges Under New Zoning Laws*

Plaintiffs filed new petitions for a writ of mandate in separate cases, challenging the Project's validity under the newly amended SNAP. After a trial held on March 30, 2017, the court vacated the City's approval of the Project. Target's appeal of that challenge is pending before us in *Citizens Coalition Los Angeles v. City of Los Angeles*, B282142.

### E. *Litigation over Attorney's Fees*

After the *La Mirada I* appeal was dismissed, plaintiffs moved for attorney's fees pursuant to section 1021.5 for prevailing on their challenges to the SNAP variances. After full briefing and a hearing, the trial court granted La Mirada attorney's fees totaling $793,817.50 and Citizens attorney's fees of $180,320. The court concluded that plaintiffs had "been successful at each stage of the litigation," and that the lawsuit had conferred a "significant benefit . . . on [City] residents" because it "upheld the building limitations specified in [the SNAP] against the City's approval of exceptions that did not meet the legal requirements for variances." The court rejected the argument that "recent amending of the" SNAP undermined the propriety of a fee award. The court went on to calculate the fee amount by evaluating the reasonableness of the time spent and the hourly rate, adjusting down a few of the hours and rates, and using a multiplier of 1.4.

6

**F.      *Appeals of Attorney's Fees Awards***

Target and the City filed timely notices of appeal from each of the attorney's fees orders. We consolidated these appeals.

## DISCUSSION

As a general rule, parties in litigation pay their own attorney's fees. (*Laffitte v. Robert Half Internat., Inc.* (2016) 1 Cal.5th 480, 488.) Section 1021.5 is an exception to that rule. (*Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection* (2010) 187 Cal.App.4th 376, 381 (*Ebbetts Pass*).) Derived from the judicially crafted "private attorney general doctrine" (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917 (*Woodland Hills*)), section 1021.5 is aimed at encouraging litigants to pursue meritorious public interest litigation vindicating important rights and benefitting a broad swath of citizens, and it achieves this aim by compensating successful litigants with an award of attorney's fees. (*Id.* at pp. 924-925; *Serrano v. Priest* (1977) 20 Cal.3d 25, 43, 47.)

Target argues that that the trial court's attorney's fees orders must be overturned because (1) plaintiffs have not established their eligibility for such fees under section 1021.5, and (2) the amount of fees awarded is excessive. We review the first question with a mixed standard of review: To the extent we construe and define the statutory requirements for an award of attorney's fees, our review is de novo; to the extent we assess whether those requirements were properly applied, our review is for an abuse of discretion. (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175; *Serrano v. Stefan Merli Plastering Co., Inc.* (2011) 52 Cal.4th 1018, 1025-1026.) We review the second question for an abuse of discretion. (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 578 (*Graham*).)

7

## I.     Eligibility for Attorney's Fees Under Section 1021.5

To obtain an order requiring the losing party to pay attorney's fees under section 1021.5, the movant must establish that (1) it is "a successful party" in an "action," (2) the action "has resulted in the enforcement of an important right affecting the public interest," (3) the action has "conferred" "a significant benefit" "on the general public or a large class of persons," and (4) an award of attorney's fees is "appropriate" in light of "the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity." (§ 1021.5; *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 317-318 (*Press*); *Ebbetts Pass*, *supra*, 187 Cal.App.4th at p. 381 [movant bears burden of proof].)  And if the successful party obtained damages, the party must also establish that the attorney's fees "should not in the interest of justice be paid out of the recovery."  (§ 1021.5.)

Target contends that the trial court erred in ruling that plaintiffs were successful (the first requirement) and that plaintiffs' action conferred a significant benefit on the general public or a large class of persons (the third requirement). Target's attack on these two requirements boils down to the same basic premise—namely, plaintiffs have yet to be successful or to confer any significant benefit because Target may yet prevail in getting the Project approved under the new zoning laws.  As we explain below, this premise is invalid.

### A.     *Success*

What does it mean to be "successful"?

When it comes to section 1021.5, the successful party is "the party to litigation that achieves its objectives."  (*Graham*, *supra*, 34 Cal.4th at p. 571; *Folsom v. Butte County Assn. of*

8

*Governments* (1982) 32 Cal.3d 668, 686 (*Folsom*) [looking to "litigation aim"]; *Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1103 (*Harbor*) [successful party is the one who "vindicate[s] the principle upon which [it] brought th[e] action"].)

This definition is both "pragmatic" and "broad." (*Graham*, *supra*, 34 Cal.4th at p. 565.) To be the successful party, a party need not obtain final judgment in its favor. (*Ibid.*; *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1290-1291.) It need not succeed on all of its claims. (*RiverWatch v. County of San Diego Depart. of Environmental Health* (2009) 175 Cal.App.4th 768, 782-783 (*RiverWatch*).) And it need not "personally benefit[]" from its success. (*Harbor*, *supra*, 43 Cal.3d at pp. 1089-1103 [party "succeeded" when court invalidated Governor's authority to make line-item veto, even though ruling would not be retroactively applied to benefit that party]; accord, *Ebbetts Pass*, *supra*, 187 Cal.App.4th at p. 382.) Indeed, because the "critical fact" to success "is the impact of the action, not the manner of its resolution" (*Folsom*, *supra*, 32 Cal.3d at p. 685), the party need not "win" the lawsuit at all: It is enough to show that the lawsuit was a "catalyst" that motivated the defendant to alter its behavior, be it through voluntary action growing out of a settlement or otherwise. (*Graham*, at p. 567; *Maria P.*, at pp. 1291-1292 [emphasizing need for "causal connection" between lawsuit and defendant's subsequent conduct].)

The trial court did not abuse its discretion in concluding that plaintiffs were a successful party for two distinct but interlocking reasons. First, plaintiffs sought a writ that would "vacate and set aside" the City Council's grant of eight variances from the SNAP, and it did so as a way to vindicate their "interest in ensuring that the City's decisions are in conformity with the

9

requirements of the [Municipal Code]." Plaintiffs achieved this objective when the trial court invalidated six of the eight variances for noncompliance with the Municipal Code. Second, plaintiffs' lawsuit served as a catalyst that motivated the City—a defendant in this action—to amend the SNAP to create a new Subarea F specifically to make the Project lawful under the Municipal Code. A party is successful when, as here, its lawsuit directly prompts a "legislative fix." (See *Sagaser v. McCarthy* (1986) 176 Cal.App.3d 288, 314 [noting that the "impact" of a lawsuit "might include legislative changes . . . or amendments in policy"].)

### B. *Significant Benefit*

Whether a successful party's lawsuit confers a "significant benefit" on the general public or a large class of persons is a function of (1) "the significance of the benefit," and (2) "the size of the class receiving [the] benefit." (*Woodland Hills*, *supra*, 23 Cal.3d at pp. 939-940.) In evaluating these factors, courts are to "realistic[ally] assess[]" the lawsuit's "gains" "in light of all the pertinent circumstances." (*Id.* at p. 940.)

A benefit need not be monetary to be significant. (§ 1021.5 [defining "a significant benefit" as either "pecuniary or nonpecuinary"].) Where, as here, the nonpecuniary benefit to the public is the proper enforcement of the law, the successful party must show that the law being enforced furthers a significant policy. (*Woodland Hills*, *supra*, 23 Cal.3d at pp. 939-940 [so holding because "the Legislature did not intend to authorize an award of attorney fees in every case involving a statutory violation"].) In such instances, the significant benefit and important right requirements of section 1021.5 to some extent dovetail. (*Id.* at p. 935 [noting that courts must exercise "some

10

selectivity" when deciding which rights are "important"]; accord, *Marini v. Municipal Court* (1979) 99 Cal.App.3d 829, 836 (*Marini*) [noting that an "important" right "cannot be based on trivial or peripheral public policies"].)

The "extent of the public benefit" from the lawsuit must be "substantial," but "need not be great." (*RiverWatch*, *supra*, 175 Cal.App.4th at p. 781; *Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 894; cf. *Concerned Citizens of La Habra v. City of La Habra* (2005) 131 Cal.App.4th 329, 335-336 [lawsuit resulted in correction of a "minute blemish" in environmental impact report; no significant benefit]; *Karuk Tribe of Northern California v. California Regional Water Quality Control Bd., North Coast Region* (2010) 183 Cal.App.4th 330, 336 [lawsuit resulted in remand for reasons articulated by the appellate court but not by the successful party; no significant benefit]; *United States v. Eastern Municipal Water Dist.* (C.D.Cal. Jan. 3, 2011, No. CV 04-8182 CBM (RNBx)) 2011 U.S.Dist. Lexis 161674 [lawsuit secured procedural victory wholly duplicated by another suit brought by United States; no significant benefit]; *Marini, supra*, 99 Cal.App.3d at pp. 837-838 [lawsuit preserved municipal court's discretion to implement a pretrial diversion program for drunk drivers, brought by drunk driver; no significant benefit].)

The trial court did not abuse its discretion in ruling that plaintiffs' lawsuit conferred a significant benefit on the general public or a large class of persons. The chief benefit identified by the trial court—requiring the City to adhere to the Municipal Code's "legal requirements" for granting variances from the SNAP—furthers a significant public policy. Our Supreme Court has consistently recognized the importance of "preserv[ing] the

11

integrity of" a "locality's governing general plan" for zoning (*Woodland Hills*, *supra*, 23 Cal.3d at p. 936), including through judicial oversight that "prevent[s] unjustified variance awards" that threaten to "subver[t] . . . the critical reciprocity upon which zoning regulation rests" (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 517-518).[2]  (Accord, *Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1263 ["Zoning laws concern 'a vital public interest'"].)  What is more, the vindication of this significant policy benefits not only the persons living near the Project and the persons living within the geographical boundaries of the SNAP at issue in this case, but also all residents of the City of Los Angeles who benefit from the trial court's ruling that holds the City Council's zoning decisions to the letter and spirit of the Municipal Code.

C.  *Impact of New Zoning Law*

Target contends that plaintiffs were not successful parties and that they have not conferred any significant benefit because the validity of the Project under the new zoning law is still pending and has yet to be finally adjudicated.  In support of this "wait and see" approach, Target makes what boils down to two arguments.

First, Target asserts that plaintiffs' objective was to stop the Target store from ever being built and that they have not yet achieved that objective because Target may still prevail in its position that the Project is valid under the new zoning law.

---

2  In light of the significance of this public policy, we need not decide whether another of the interests served by the zoning laws—namely, preserving adequate housing—is itself independently significant.

12

This assertion is both factually inaccurate and legally untenable.

It is factually inaccurate because the stated objective of plaintiffs' writ petitions, with respect to the SNAP variances, was to set aside and invalidate the eight variances initially granted by the City Council as well as to enjoin any further construction contingent upon their validity. At no point did plaintiffs allege that their writ petitions were aimed at stopping the Project forevermore.

Target's assertion is also legally untenable because success for purposes of section 1021.5 does not require a showing that the successful party put the entire dispute to rest for once and all. To the contrary, section 1021.5 contemplates "interim attorney fee awards" for successes conferring a significant benefit before the matter is finally litigated. (*Bell v. Farmers Ins. Exchange* (2001) 87 Cal.App.4th 805, 832-833.) As long as an interim benefit is "complete regardless of subsequent proceedings," a court may recognize that benefit by an award of attorney's fees. (*Ciani v. San Diego Trust & Savings Bank* (1994) 25 Cal.App.4th 563, 576; *Center for Biological Diversity v. County of San Bernardino*, *supra*, 185 Cal.App.4th at p. 895 ["the 'substantial benefit' criterion" is to be considered "in the context of the outcome of the current litigation, and not on speculative future events"].)

In this case, the trial court's ruling that the SNAP variances violated the Municipal Code as it existed at that time was reduced to a judgment, a judgment that was left intact after *La Mirada I.* For that reason, the rulings underlying the fee awards in this case are more final than the typical "interim" ruling handed down before judgment. Indeed, the judgments in this case are interim only against the backdrop of the broader

13

litigation between the parties, which continues only because the City amended the zoning law and thereby prompted a new round of petitions challenging the Project under the new zoning law. That the City by amending the zoning law is just trying to "get it right," as Target urges, is beside the point; the proper focus is on the "litigation objectives" of the prevailing plaintiff (*Graham, supra*, 34 Cal.4th at pp. 571-572), not the motives of the losing defendant.

What is more, Target's assertion leads to an absurd result. A court may only grant writ relief after applying "'the law in existence at the time of its decision.'" (*Atlantic Richfield Co. v. Board of Supervisors* (1974) 40 Cal.App.3d 1059, 1065, italics omitted.) Consequently, a writ petitioner can, at most, seek to invalidate a "final administrative order or decision" under the law then in existence. (§ 1094.5, subd. (a).) Target, however, invites us to deny attorney's fees to a writ petitioner who succeeds under the law in existence at the time because it has yet to succeed under the law *as it might be amended in the future*, even though that petitioner cannot seek (and a court cannot award) such "now-and-forevermore" relief. We decline to define success as requiring one to achieve the impossible.

Second, Target cites cases holding that a party may not obtain attorney's fees under section 1021.5 "until the benefit is secure." (*Folsom, supra*, 32 Cal.3d at p. 679; *Urbaniak v. Newton* (1993) 19 Cal.App.4th 1837, 1844.) Applying this standard, courts have held that a party's success in overturning a grant of summary judgment against it is not "secure" because the victory merely sets the matter for trial, where the merits will be determined for the first time. (*Urbaniak*, at p. 1844; *Miller v. California Com. on Status of Women* (1985) 176 Cal.App.3d

14

454, 458-459.) These cases are distinguishable where, as here, the party has obtained a final judgment in its favor on the merits under the law in existence at the time and where what remains to be finally adjudicated is the validity of a project under the law as subsequently amended.[3]

## II. Amount of Fees

In fixing the amount of attorney's fees to be awarded under section 1021.5, a trial court must: (1) calculate a "lodestar" amount of fees, which is defined as the product of (a) the reasonable number of hours spent litigating the matter, and (b) the reasonable rate of hourly compensation; (2) decide whether to allocate those fees between claims on which the successful party prevailed and those on which it did not; and (3) determine whether to apply a "multiplier" that either increases or decreases the amount of fees. (*Graham*, *supra*, 34 Cal.4th at p. 579; *Press*, *supra*, 34 Cal.3d at p. 322; *Woodland Hills*, *supra*, 23 Cal.3d at p. 942.) Target attacks the trial court's rulings on each of these three steps.

### A. *Calculation of Lodestar*

In calculating the lodestar figure, the trial court "'must carefully review attorney documentation of hours expended'" and examine the "'prevailing hourly rates.'" (*Graham*, *supra*, 34 Cal.4th at p. 579.) In this case, the trial court examined the declarations and billing records submitted by each plaintiff and

---

[3] In light of our conclusion that the trial court did not abuse its discretion in finding that plaintiffs were successful and conferred a significant benefit in obtaining a judgment invalidating the SNAP variances under the prior law, we need not decide whether plaintiffs independently succeeded and conferred a significant benefit for the litigation that resulted in the published opinion in *La Mirada I*.

15

ultimately discounted all of the time spent by one of La Mirada's attorneys and reduced the hourly rate of Citizens' attorney.

Target assails the trial court's calculation of the lodestar by complaining generally that plaintiffs used too many lawyers and "impermissibly high [hourly] rates."  As the appellant, Target has the burden to affirmatively show error in this calculation (*Vaughn v. Jonas* (1948) 31 Cal.2d 586, 601); Target's generalized, broadside attack does not do so.  Target further asserts that the trial court "ignored" its expert's contrary opinions regarding the reasonableness of the time spent and the hourly rates, but the court did no such thing; instead, it considered, but ultimately "disagree[d]" with those opinions.

**B.** *Allocation*

A trial court has the discretion to reduce the lodestar "based on the plaintiff's degree of success."  (*Save Our Uniquely Rural Community Environment v. County of San Bernardino* (2015) 235 Cal.App.4th 1179, 1185; *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989.)  However, this discretion must be exercised against the backdrop policy that fee awards under section 1021.5 "ordinarily include compensation for all hours reasonably spent."  (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 624, 639; *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1133 (*Ketchum*).)  This background presumption acknowledges that attorneys will not know in advance which of many potentially meritorious legal theories a court will adopt and that the reduction of "attorneys' fees of a successful party because he did not prevail on *all* [of those theories], makes it the attorney, and not the defendant, who pays the cost of enforcing th[e] public right."  (*Sundance v. Municipal Court* (1987) 192 Cal.App.3d 268, 273, italics added;

16

*Guardians of Turlock's Integrity v. Turlock City Council* (1983) 149 Cal.App.3d 584, 601.)

Target argues that the trial court abused its discretion in not reducing the lodestar amount to account for plaintiffs' failure to prevail on their CEQA challenge, their due process challenge, their open meeting law challenge, and their challenges to two of the eight SNAP variances. Contrary to what Target asserts, the trial court was not *required* to allocate the attorney's fees between the successful and unsuccessful claims. Because Target makes no further argument as to why the trial court abused its discretion in declining to depart from the baseline presumption favoring an award for "all hours reasonably spent," we have no basis to disturb the court's decision not to do so.

### C. *Multiplier*

A trial court also has the discretion to adjust the attorney's fees award upwards or downwards by applying a multiplier to the lodestar. (*Ketchum*, *supra*, 24 Cal.4th at pp. 1131-1132.) In deciding whether to exercise this discretion, courts typically examine "'(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, and (4) the contingent nature of the fee award.'" (*Graham*, *supra*, 34 Cal.4th at p. 579, quoting *Ketchum*, at p. 1132.) In this case, the trial court elected to apply a multiplier because plaintiffs' counsel "worked on a contingency," "received no compensation for four years" other than $17,000 in costs, "had to decline other non-contingent engagements" and "accomplished a significant public benefit." The court nonetheless noted that "[t]hese circumstances are, to some extent, offset by the certainty [plaintiffs] will be able to collect the

17

full amount of the attorney's fees award."  Thus, the court rejected La Mirada's request for a multiplier of 2 and Citizens' request for a multiplier of 1.75, and instead applied one of 1.4 to both fee awards.

Target does not appear to attack the trial court's examination of the factors relevant to applying the multiplier, but instead asserts that the multiplier renders the fee awards excessive in light of the "high base fees" already included in the lodestar.  This argument fails because we have already rejected its premise:  The court did not fix the lodestar at an unreasonably high level.  Moreover, the court's ultimate fee awards are not unreasonably high for the duration, complexity, and intensity of litigation that underlies the fee awards in this case.

## DISPOSITION

The orders are affirmed.  Plaintiffs are entitled to their costs on appeal.

## <u>CERTIFIED FOR PARTIAL PUBLICATION.</u>

_____, J.
HOFFSTADT

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
CHAVEZ

18